UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

JUL 28 2000

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:98CR177 DJS • |
| ) | 4:97CR290 DJS |
| CHARLES THOMAS SELL, ) | (Consolidated) |
| ) | |
| Defendant. ) | |

**INTERIM MEMORANDUM AND ORDER
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the court on the government's motion to involuntarily medicate the defendant using anti-psychotic drugs. The government further requests that the defendant's period of commitment be extended while the defendant is involuntarily medicated. On September 29, 1999, the undersigned held a hearing on the motion. Based on this hearing as well as other matters detailed below, the undersigned makes the following findings of fact and interim conclusions:

**Background and Findings of Fact**

On May 16, 1997, defendant Charles Sell was charged in a complaint with making false representations in connection with the payment of health care services in violation of 18 U.S.C. § 1035(a)(2). On that same date, the defendant was arrested and afforded his initial appearance. On May 20, 1997, the government filed a motion for psychiatric examination of the defendant to determine his competency to stand trial. The motion states that the defendant has a history of mental illness, and is described by his employees as irrational and prone to angry and violent outbursts. On May 20, 1997, a magistrate judge granted the motion and the defendant

225

was sent to the U.S. Medical Center for Federal Prisoners at Springfield, Missouri, for an evaluation.

On July 2, 1997, a psychiatric evaluation report was received from Springfield, and on July 15, 1997, a hearing was held to determine the defendant's competency to stand trial. At the hearing, the court, without objection, considered the psychiatric evaluation report from Springfield. The report concluded that the defendant was currently competent to stand trial, but that there was a possibility that the defendant could, in the future, develop a psychotic episode, and that his paranoid personality characteristics would color his relationship with his counsel. Based on the report, the judge found the defendant currently competent to stand trial. On July 30, 1997, an indictment was returned against the defendant and his wife charging them with fifty-six counts of mail fraud, six counts of medicaid fraud, and one count of money laundering.

Six months later, on January 22, 1998, a petition was filed alleging that the defendant violated his conditions of release by attempting to intimidate a witness. Based on this petition, a warrant was issued for the defendant's arrest. On January 23, 1998, the defendant was arrested and brought to a magistrate judge's courtroom for his initial appearance. At that point, the defendant was out of control, screaming, shouting, and using racial epithets. Because of the defendant's out-of-control behavior and at the request of the U.S. Marshals Service, the judge attempted to conduct the initial appearance in the Marshal's secure area. As the proceeding commenced, Dr. Sell began screaming and shouting personal insults at the judge and, as the judge started to advise the defendant of his rights, the defendant spat directly in the judge's face. In the judge's words, the defendant appeared "totally out of control."

On January 26, 1998, a bond revocation hearing was held and shortly thereafter, the defendant's bond was revoked and he was ordered detained. One factor considered by the judge was the report of a psychiatrist who was seeing Dr. Sell as a part of Dr. Sell's conditions of release. The psychiatrist reported that, as of January 21, 1998, Dr. Sell's mental condition was worsening. He said that Dr. Sell was not sleeping at night because he was staying up guarding his doors because he was expecting the FBI to "come busting through the door." The psychiatrist said that while Dr. Sell was not an immediate danger, this status could change at any time and Dr. Sell could become a danger.

On April 23, 1998, the defendant was charged in a second indictment with one count of conspiring to murder a witness in his fraud case and conspiring to murder an FBI agent who was working on the case; four counts of attempting to murder two separate witnesses in the case, and two counts of attempting to murder an FBI agent.

During the next several months, this matter was set for trial on multiple occasions, but was continued at the request of both parties. The defendant appealed at least two matters to the Court of Appeals during this time period. Finally, on February 10, 1999, the defendant filed a motion asking this court to hold a hearing and determine whether or not Dr. Sell was competent to proceed to trial in this matter. The motion stated that in the opinion of Dr. Sell's psychiatrist and psychologist, Dr. Sell was not currently competent to proceed to trial. On February 22, 1999, the undersigned granted the government's separate motion to have Dr. Sell examined at the Springfield Medical Center to aid in the determination of the defendant's competency to stand trial. On April 14, 1999, the undersigned held a hearing to determine Sell's competency. Based on the evidence presented at that hearing, and without objection from the defendant, the

undersigned found that the defendant was presently suffering from a mental disease or defect rendering him mentally incompetent to stand trial, particularly finding that the defendant was not competent to assist properly in his defense.

On April 14, 1999, based on this finding, the undersigned determined that Dr. Sell was incompetent to stand trial, and ordered that Dr. Sell be hospitalized for treatment in the U.S. Medical Center for Federal Prisoners for a period not to exceed four months to determine whether there was a substantial probability that the defendant would attain the capacity to allow his trial to proceed.

In June, 1999, an administrative hearing regarding the involuntary administration of anti-psychotic medication was held at the U.S. Medical Center for Federal Prisoners. Pursuant to this court's order, defendant's counsel was allowed to participate in the hearing. On July 15, 1999, based on findings made by the hearing officer, the involuntary administration of anti-psychotic medication was authorized by the institution.

On August 20, 1999, the undersigned granted defendant's motion for a judicial hearing to determine the propriety of the administration of anti-psychotic medication and stayed the administration of the medication by the institution pending the hearing. The undersigned also granted the institution's request to grant a 120-day extension of his commitment to Springfield. As stated, the hearing was held on September 29, 1999. The evidence, as submitted at the hearing by the testimony of a psychiatrist and psychologist from the Springfield medical center, as well as the affidavit of the defendant's psychiatrist revealed the following:

Dr. Richart DeMier, Ph.D., is a staff psychologist at the Medical Center for Federal Prisoners, Springfield, Missouri, and has been so employed for approximately five years.

Dr. DeMier is the staff psychologist primarily responsible for the diagnosis of Dr. Sell's illness and for the day-to-day treatment of Dr. Sell. He has been in at least weekly contact with Dr. Sell, both during his first admission to the hospital, and during his most recent commitment in April, 1999. In addition to very frequently seeing and talking to Dr. Sell, DeMier also receives frequent reports from the staff of the medical center who are in daily contact with the defendant.

Based on these interviews and other information, Dr. DeMier has concluded that Dr. Sell is suffering from delusional disorder of the persecutory type, a very serious and potentially dangerous psychosis. Dr. DeMier also concluded that the defendant's judgment is very poor and becoming worse each day that he is not treated with anti-psychotic medications.

As evidence of this deterioration, in July, 1999, Sell formed an infatuation with a female nurse on the staff of the medical center. He told the nurse that she was very special to him, and that the nurse did not realize how much she meant to him. When told that it was inappropriate to talk to the nurse in this familiar manner, he did not stop the familiarity, and told the nurse and other staff members that he could not help himself, and that he could not stop this conduct. Although he did not touch the nurse, he said that he would do so if she asked him, and the nurse considered him to be a danger to her safety. During this same time, the defendant also told DeMier that he was afraid to be transferred to a county jail because he was certain that the FBI was actively involved in a plan to have him murdered. He also told DeMier that DeMier would be ordered to release him from custody so he could go to Bosnia with his army reserve unit, as this was essential to the national security. He told DeMier that if he did not release him, DeMier would be personally called before Congress and disciplined.

5

Because of Sell's specific focus on the nurse, his increasing personalization of the perceived murder plot by the FBI; his personalization of animosity toward DeMier for not allowing him to join his reserve unit; along with the defendant's history of committing an assault on a federal judge, and the fact that the defendant was charged with conspiring to murder an FBI agent and two witnesses in his case; DeMier concluded at the September 29, 1999 hearing, that the defendant was an immediate risk to commit violent acts, and was dangerous to himself and to others. DeMier said that because Sell believes that people (including the FBI and DeMier) are out to get him, given Sell's mental condition, Sell is likely to "protect himself" by harming people who have no intention of doing any harm to him. The fact that Sell's delusional beliefs have become more focused makes Sell an immediate risk of violence to himself or others.

Because of this danger, Sell is being held in the most secure area of the Springfield medical center, and is allowed out of his holding area only for short periods of time. Although this ameliorates the defendant's danger to himself and the staff, it does not eliminate this danger because the staff still must have substantial contact with him.

DeMier also believes that, based on his training and experience, the only treatment that will improve Sell's condition is the use of anti-psychotic medications. He further believes that if Sell does not receive anti-psychotic medication, his condition will continue to deteriorate. However, if anti-psychotic medications are administered, it is likely that the defendant will be restored to competency and, at any rate, that the danger caused to the staff by Sell's condition will be greatly reduced.

DeMier has treated two patients in the recent past for delusional disorder with anti-psychotic medications, and both treatments were successful. One of the patients was

restored to competency, and the other patient was greatly improved and rendered not dangerous to the extent that he was released from prison. DeMier also believes that the benefits of using anti-psychotic medications greatly outweigh any risks, and that the use of these medications is the only way to render the defendant not dangerous and to restore him to competency. According to the medical literature, anti-psychotic medication is the treatment of choice for delusional disorder, and delusional disorder responds favorably to the use of anti-psychotic medications.

Dr. James Wolfson, M.D., is a staff psychiatrist at the Springfield medical center and is the consulting psychiatrist on Dr. Sell's case. Based on his interviews of Dr. Sell, and his review of the medical center's records, it is Wolfson's opinion that Sell is psychotic, and that the only way to treat Sell's condition is with anti-psychotic medications. Without this treatment, Wolfson believes that Sell's condition will continue to deteriorate. Further, based on Sell's history and conduct, Sell is currently dangerous, and anti-psychotic medications will greatly reduce the risk of violence by Dr. Sell, and will render him not dangerous.

Dr. Wolfson has treated 1,000 to 2,000 patients with anti-psychotic medications, and has achieved good results in a great majority of these cases. In addition to rendering Sell less dangerous, Wolfson believes that there is a good chance that Sell can be restored to competency by the use of anti-psychotic medications. In the recent past, Wolfson has used anti-psychotic medications on five patients with delusional disorder, and has been successful in restoring four of these patients to competency, an eighty per cent success rate.

Further, Wolfson vehemently disagrees with the defendant's psychiatrist, that anti-psychotic drugs are not effective in the treatment of delusional disorder. Wolfson says that the medical literature, his own experience, and the very experts relied on by the defendant's

psychiatrist, show that anti-psychotic medications, when combined with psychotherapy, are effective in the treatment of delusional disorder. Further, even the defendant's psychiatrist agrees that anti-psychotic drugs are effective in the control of agitation and dangerousness in patients with delusional disorder.

According to Wolfson, there are three main side effects involved in using anti-psychotic drugs. The first is tartive dyskinesia. This side effect causes a person to have involuntary body movements of various parts of the body. This is not a permanent side effect, and this condition can be ameliorated by the use of other medications along with the anti-psychotic drugs, or by switching from one anti-psychotic medication to another anti-psychotic medication. The side effect is not life threatening, and as stated is not a permanent side effect, but will go away with the use of other medications or withdrawal of the medication.

Another side effect is that some patients are somewhat sedated by the medication. With newer drugs, this side effect occurs infrequently and can be alleviated by changing the dosage of the medication. Further, because one of the purposes of the medication is to allow patients to assist effectively in the preparation and defense of their cases, Wolfson uses medications that do not significantly sedate the defendant or impair the ability of the defendant to assist in his own defense.

According to Wolfson, the other major serious side effect from the medication is neuroleptic malignant carcinoma which can be fatal. Of the 1,000 to 2,000 patients Wolfson has medicated with anti-psychotic drugs, none have developed this syndrome, and Wolfson has seen this complication occur only once during his career. According to the medical literature, this condition occurs in about 1 in 10,000 patients who take the medication. Further, Dr. Wolfson

desires to medicate the defendant with newer drugs, which have a much lower side effect profile than older medications.

It is also Wolfson's opinion that the only way to treat Sell's condition is with the use of anti-psychotic drugs, and it would be irresponsible and wrong not to use these medications. Without these medications the defendant will continue to suffer from a catastrophic and debilitating illness, from which he is never likely to recover. For all of these reasons, Wolfson believes that the benefits of using the medication far outweigh any risk from the medication in any patient he would treat for this illness, whether or not the person was incarcerated.

At the conclusion of the hearing, both the defendant and the government requested permission to delay briefing the issues presented at the hearing until after a transcript was prepared. After requests for more time to file the memoranda by both parties, the briefs were eventually filed before the court at the end of January, 2000. Almost simultaneously with the filing of these memoranda, on January 31, 2000, Sell's attorneys filed a motion for relief from involuntary commitment stating that he was being illegally held at Springfield beyond the time permitted by the statute, and requesting that he be immediately released. Further, in partial response to this motion, the government filed a motion for the extension of Dr. Sell's commitment to Springfield on February 3, 2000.

On March 20, 2000, the U.S. Medical Center for Federal Prisoners wrote the court asking that Dr. Sell's commitment be extended. Included in the report, is a report from Dr. DeMier on Sell's mental condition. The report states that Sell's condition has deteriorated to the extent that the risk of physical injury to the staff and to Dr. Sell has become greater because of

Sell's increased volatility and paranoia. Dr. DeMier also states that Sell's infatuation with the nurse at the facility has worsened to the point that his thoughts about her have outweighed other issues that should be much more important to him. DeMier described Sell's behavior as volatile because it can change suddenly without any apparent reason. In summary, DeMier concludes as follows:

> Anti-psychotic medication remains the only effective treatment for his mental illness. Without the opportunity to treat the defendant, he will continue to suffer from a debilitating and catastrophic illness, and we are placed at increased, even inevitable, risk of harm to the defendant or those charged with his care.

He further states that the use of anti-psychotic medications will provide the defendant with a good chance of being restored to competency.

### Conclusions

Based on the above, it is the undersigned's intention to order the forced medication of Dr. Sell. In the case of Riggins v. Nevada, 504 U.S. 127 (1992), the court stated as follows:

> Although we have not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings, Nevada certainly would have satisfied due process if the prosecution had demonstrated and the district court had found that treatment with anti-psychotic medication was medically appropriate and considering less intrusive alternatives essential for the sake of Riggins' own safety and the safety of others.

504 U.S. 127, 135.

Further, in United States v. Morgan, 193 F.2d 252 (4th Cir. 1999). The court stated as follows in ordering the forced medication of a pretrial detainee:

10

> The fact remains, however, that the finding that treatment with anti-psychotic medication was necessary to render Morgan competent to stand trial was accompanied by a finding that such medication was necessary because he is dangerous to himself and to others at Springfield. Although Morgan provides us with no psychiatric evidence supporting a conclusion that the dangerousness finding was made arbitrarily, he essentially requests that we disregard that finding so that we may evaluate the constitutionality of permitting Springfield medical personnel to make the determination of whether to forcibly medicate him solely for the purpose of rendering him competent to stand trial. This we are unwilling to do. We realize that forcibly medicating a pretrial detainee on the basis that such treatment is necessary because he is dangerous to himself or others in the institutional setting might have the incidental effect of rendering him competent to stand trial. However, if such an occurrence would come to pass in the present matter, Morgan would not simply be thrust into the courtroom for trial without additional procedural protections. Rather, he would be statutorily entitled to have a district judge conduct a pretrial examination of his competency to stand trial in the context of an evidentiary hearing at which time he would be represented by counsel and permitted 'to testify, to present evidence, to subpoena witnesses on his own behalf, and to confront and cross examine witnesses who appear at that hearing.' Morgan could be brought to trial only if the government proved to the district judge by a preponderance of the evidence that Morgan was able to understand the nature and consequences of the proceedings against him and to assist properly in his defense...Assuming that the government succeeded in this regard, Morgan may be entitled to even further procedural protection should the government forcibly plan to medicate him at any point during trial. Specifically, due process would require the district judge make findings as to the need for and medical appropriateness of such medication during trial.

193 F.3d 252, 264.

Given the above law, the undersigned concludes that the government has made a substantial and very strong showing that Dr. Sell is a danger to himself and others at the institution in which he is currently incarcerated. In addition, the government has shown that medication is the only way to render him less dangerous, and that the serious side effects of the

11

medication may be ameliorated by newer drugs and/or changing of the drugs.  Further, the benefits to Dr. Sell of using the medication far outweigh any risks, the use of such medication is necessary, and a strong showing of the necessity to use this medication has been made by the government.

In addition, an ancillary effect of the use of the medication, because Dr. Sell is dangerous, is that there is a substantial probability that Dr. Sell will be returned to competency.  Based on this fact, the undersigned grants the government's motion for extension of his commitment for a 120-day period of time, because there is a substantial probability that within such period of time, Dr. Sell will attain the capacity to permit the trial to proceed if medicated.  Because the defendant has (as is his absolute right) refused to take anti-psychotic medication, the government has not yet had an opportunity to use its treatment of choice.  Further, as in United States v. Kokoski, 82 F.3d 411 (4th Cir. 1996) and United States v. Ecker, 30 F.3d 966 (8th Cir.), cert. denied, 513 U.S. 1064 (1994), the defendant is charged with very serious offenses for which the potential penalty far exceeds the length of time the defendant has currently been detained.  Therefore, the government's motion for an extension is granted.

In addition, a more detailed memorandum setting forth the undersigned's reasons, analysis of the law, and an order granting the forced medication both for the purpose of rendering the defendant less dangerous and for restoring his mental competency will be forthcoming by August 11, 2000.  As is stated above, although this interim order grants the government's motion for extension of commitment, it **does not**, at this time, grant the government's request that the defendant be involuntarily medicated.

Therefore,

**IT IS HEREBY ORDERED** that the government's request for an extension of the defendant's commitment be **granted**, and that his commitment is ordered extended for a 120-day period of time effective as of the date of this order.

_____
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of July, 2000.

```
              UNITED STATES DISTRICT COURT -- EASTERN MISSOURI
                        INTERNAL RECORD KEEPING


AN ORDER, JUDGMENT OR ENDORSEMENT WAS SCANNED, FAXED AND/OR MAILED TO THE
FOLLOWING INDIVIDUALS ON 07/31/00 by pdalziel
             4:98cr177     USA vs Sell


COPIES FAXED AND/OR MAILED TO THE PARTIES LISTED BELOW AND THE
UNITED STATES PROBATION OFFICE AND UNITED STATES PRETRIAL SERVICE OFFICE.
IF THIS IS A JUDGMENT IN A CRIMINAL CASE SEND CERTIFIED COPIES TO THE
FOLLOWING:     4 Certified Copies to USM
               2 Certified Copies to USP
               1 Copy to Financial
               1 Copy to O.S.U.

Linda Hogan   -  69095            Fax: 314-721-1710
Lee Lawless   -  3650             Fax: 314-421-3177
Howard Marcus -  16980            Fax: 314-539-7695
Arthur Margulis -  7883           Fax: 314-721-1710
Barry Short   -  4358             Fax: 314-241-6056
```

SCANNED & FAXED BY:

JUL 3 1 2000

C. L. F.