UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED
AUG 09 2000
U. S. DISTRICT COURT
E. DIST. OF MO.
ST. LOUIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:98CR177 DJS |
| ) | 4:97CR290 DJS |
| CHARLES THOMAS SELL, ) | (Consolidated) |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on the government's motion to involuntarily medicate the defendant using anti-psychotic drugs. The government further requests that the defendant's period of commitment be extended while the defendant is involuntarily medicated. On September 29, 1999, the undersigned held a hearing on the motion. Based on this hearing as well as other matters detailed below, the undersigned makes the following findings of fact and conclusions:

### Background and Findings of Fact

On May 16, 1997, defendant Charles Sell was charged in a complaint with making false representations in connection with the payment of health care services in violation of 18 U.S.C. § 1035(a)(2). On that same date, the defendant was arrested and afforded his initial appearance. On May 20, 1997, the government filed a motion for psychiatric examination of the defendant to determine his competency to stand trial. The motion states that the defendant has a history of mental illness, and is described by his employees as irrational and prone to angry and violent outbursts. On May 20, 1997, a magistrate judge granted the motion and the defendant

#227

was sent to the U.S. Medical Center for Federal Prisoners at Springfield, Missouri, for an evaluation.

On July 2, 1997, a psychiatric evaluation report was received from Springfield, and on July 15, 1997, a hearing was held to determine the defendant's competency to stand trial. At the hearing, the court, without objection, considered the psychiatric evaluation report from Springfield. The report concluded that the defendant was currently competent to stand trial, but that there was a possibility that the defendant could, in the future, develop a psychotic episode, and that his paranoid personality characteristics would color his relationship with his counsel. Based on the report, the judge found the defendant currently competent to stand trial. On July 30, 1997, an indictment was returned against the defendant and his wife charging them with fifty-six counts of mail fraud, six counts of medicaid fraud, and one count of money laundering.

Six months later, on January 22, 1998, a petition was filed alleging that the defendant violated his conditions of release by attempting to intimidate a witness. Based on this petition, a warrant was issued for the defendant's arrest. On January 23, 1998, the defendant was arrested and brought to a magistrate judge's courtroom for his initial appearance. At that point, the defendant was out of control, screaming, shouting, and using racial epithets. Because of the defendant's out-of-control behavior and at the request of the U.S. Marshals Service, the judge attempted to conduct the initial appearance in the Marshal's secure area. As the proceeding commenced, Dr. Sell began screaming and shouting personal insults at the judge and, as the judge started to advise the defendant of his rights, the defendant spat directly in the judge's face. In the judge's words, the defendant appeared "totally out of control."

On January 26, 1998, a bond revocation hearing was held and shortly thereafter, the defendant's bond was revoked and he was ordered detained. One factor considered by the judge was the report of a psychiatrist who was seeing Dr. Sell as a part of Dr. Sell's conditions of release. The psychiatrist reported that, as of January 21, 1998, Dr. Sell's mental condition was worsening. He said that Dr. Sell was not sleeping at night because he was staying up guarding his doors because he was expecting the FBI to "come busting through the door." The psychiatrist said that while Dr. Sell was not an immediate danger, this status could change at any time and Dr. Sell could become a danger. He said Dr. Sell needed to be treated with anti-psychotic medications.

On April 23, 1998, the defendant was charged in a second indictment with one count of conspiring to murder a witness in his fraud case and conspiring to murder an FBI agent who was working on the case, four counts of attempting to murder two separate witnesses in the case, and two counts of attempting to murder an FBI agent.

During the next several months, this matter was set for trial on multiple occasions, but was continued at the request of both parties. The defendant appealed at least two matters to the Court of Appeals during this time period. On February 10, 1999, the defendant filed a motion asking this court to hold a hearing and determine whether or not Dr. Sell was competent to proceed to trial in this matter. The motion stated that in the opinion of Dr. Sell's psychiatrist and psychologist, Dr. Sell was not currently competent to proceed to trial. On February 22, 1999, the undersigned granted the government's separate motion to have Dr. Sell examined at the Springfield Medical Center to aid in the determination of the defendant's competency to stand trial. On April 14, 1999, the undersigned held a hearing to determine Sell's competency. Based

on the evidence presented at that hearing, and without objection from the defendant, the undersigned found that the defendant was presently suffering from a mental disease or defect rendering him mentally incompetent to stand trial, particularly finding that the defendant was not competent to assist properly in his defense.

On April 14, 1999, based on this finding, the undersigned determined that Dr. Sell was incompetent to stand trial, and ordered that Dr. Sell be hospitalized for treatment in the U.S. Medical Center for Federal Prisoners for a period not to exceed four months to determine whether there was a substantial probability that the defendant would attain the capacity to allow his trial to proceed.

In June, 1999, an administrative hearing regarding the involuntary administration of anti-psychotic medication was held at the U.S. Medical Center for Federal Prisoners. Pursuant to this court's order, defendant's counsel was allowed to participate in the hearing. In July of 1999, based on findings made by the hearing officer, the involuntary administration of anti-psychotic medication was authorized by the institution.

On August 20, 1999, the undersigned granted defendant's motion for a judicial hearing to determine the propriety of the administration of anti-psychotic medication, and stayed the administration of the medication by the institution pending the hearing. The undersigned also granted the institution's request to grant a 120-day extension of his commitment to Springfield. As stated, the hearing was held on September 29, 1999. The evidence, as submitted at the hearing by the testimony of a psychiatrist and psychologist from the Springfield medical center, as well as the affidavit of the defendant's psychiatrist and other defense exhibits revealed the following:

Dr. Richart DeMier, Ph.D., is a staff psychologist at the Medical Center for Federal Prisoners, Springfield, Missouri, and has been so employed for approximately five years. Dr. DeMier is the staff psychologist primarily responsible for the diagnosis of Dr. Sell's illness and for the day-to-day treatment of Dr. Sell. He has been in at least weekly contact with Dr. Sell, both during his first admission to the hospital, and during his most recent commitment in April, 1999. In addition to very frequently seeing and talking to Dr. Sell, DeMier also receives frequent reports from the staff of the medical center who are in daily contact with the defendant.

Based on these interviews and other information, Dr. DeMier has concluded that Dr. Sell is suffering from delusional disorder of the persecutory type, a very serious and potentially dangerous psychosis. Dr. DeMier also concluded that the defendant's judgment is very poor and becoming worse each day that he is not treated with anti-psychotic medications.

As evidence of this deterioration, in July, 1999, Sell formed an infatuation with a female nurse on the staff of the medical center. He told the nurse that she was very special to him, and that the nurse did not realize how much she meant to him. When told that it was inappropriate to talk to the nurse in this familiar manner, he did not stop the familiarity, and told the nurse and other staff members that he could not help himself, and that he could not stop this conduct. Although he did not touch the nurse, he said that he would do so if she asked him, and the nurse considered him to be a danger to her safety. He also told staff members that he could "smell" the nurse's presence. During this same time, the defendant also told DeMier that he was afraid to be transferred to a county jail because he was certain that the FBI was actively involved in a plan to have him murdered. He also told DeMier that DeMier would be ordered to release him from custody so he could go to Bosnia with his army reserve unit, as this was essential to the

5

national security. He also told DeMier that DeMier would be personally called before Congress to explain his mishandling of Dr. Sell's case.

Because of Sell's specific focus on the nurse, his increasing personalization of the perceived murder plot by the FBI, his personalization of animosity toward DeMier along with the defendant's history of committing an assault on a federal judge, and the fact that the defendant was charged with conspiring to murder an FBI agent and two witnesses in his case, DeMier concluded at the September 29, 1999 hearing, that the defendant was an immediate risk to commit violent acts, and was dangerous to himself and to others. DeMier said that because Sell believes that people (including the FBI and DeMier) are out to get him, given Sell's mental condition, Sell is likely to "protect himself" by harming people who have no intention of doing any harm to him. The fact that Sell's delusional beliefs have become more focused makes Sell an immediate risk of violence to himself or others.

Because of this danger, Sell is being held in the most secure area of the Springfield medical center, and is allowed out of his holding area only for short periods of time. Although this ameliorates the defendant's danger to himself and the staff, it does not eliminate this danger because the staff still must have contact with him.

DeMier also believes that, based on his training and experience, the only treatment that will improve Sell's condition is the use of anti-psychotic medications, because there is no other effective treatment for the illness. He further believes that if Sell does not receive anti-psychotic medication, his condition will continue to deteriorate. However, if anti-psychotic medications are administered, it is likely that the defendant will be restored to competency, and that the danger caused to the staff by Sell's condition will be greatly reduced.

6

DeMier has treated two patients in the recent past for delusional disorder with anti-psychotic medications, and both treatments were successful. One of the patients was restored to competency, and the other patient was greatly improved and rendered not dangerous to the extent that he was released from prison. DeMier also believes that the benefits of using anti-psychotic medications greatly outweigh any risks, and that the use of these medications is the only way to render the defendant not dangerous and to restore him to competency. According to the medical literature, anti-psychotic medication is the treatment of choice for delusional disorder, and delusional disorder responds favorably to the use of anti-psychotic medications.

Dr. James Wolfson, M.D., is a staff psychiatrist at the Springfield medical center and is the consulting psychiatrist on Dr. Sell's case. Based on his interviews of Dr. Sell, and his review of the medical center's records, it is Wolfson's opinion that Sell is psychotic, and that the only way to treat Sell's condition is with anti-psychotic medications. Without this treatment, Wolfson believes that Sell's condition will continue to deteriorate. Further, based on Sell's history and conduct, Sell is currently dangerous, and anti-psychotic medications will greatly reduce the risk of violence by Dr. Sell, and will render him not dangerous.

Dr. Wolfson has treated 1,000 to 2,000 patients with anti-psychotic medications, and has achieved good results in a great majority of these cases. In addition to rendering Sell less dangerous, Wolfson believes that there is a good chance that Sell can be restored to competency by the use of anti-psychotic medications. In the recent past, Wolfson has used anti-psychotic medications on five patients with delusional disorder, and has been successful in restoring four of these patients to competency, an eighty per cent success rate.

7

Further, Wolfson vehemently disagrees with the defendant's psychiatrist, that anti-psychotic drugs are not effective and should not be used in the treatment of delusional disorder. Wolfson says that the medical literature, his own experience, and the very experts relied on by the defendant's psychiatrist, show that anti-psychotic medications, when combined with psychotherapy, are effective in the treatment of delusional disorder. Further, even the defendant's psychiatrist agrees that anti-psychotic drugs are effective in the control of agitation and dangerousness in patients with delusional disorder.

According to Wolfson, there are three main side effects involved in using anti-psychotic drugs. The first is tartive dyskinesia and/or distonic reaction. This side effect causes a person to have involuntary body movements of various parts of the body. This is not a permanent side effect, and this condition can be ameliorated by the use of other medications along with the anti-psychotic drugs, or by switching from one anti-psychotic medication to another anti-psychotic medication. The side effect is not life threatening, and as stated is not a permanent side effect, but will go away with the use of other medications or withdrawal of the medication.

Another side effect is that some patients are somewhat sedated by the medication. With newer drugs, this side effect occurs infrequently and can be alleviated by changing the dosage of the medication. Further, because one of the purposes of the medication is to allow patients to assist effectively in the preparation and defense of their cases, Wolfson uses medications that do not significantly sedate the defendant or impair the ability of the defendant to assist in his own defense.

According to Wolfson, the other major serious side effect from the medication is neuroleptic malignant carcinoma which can be fatal. Of the 1,000 to 2,000 patients Wolfson has medicated with anti-psychotic drugs, none have developed this syndrome, and Wolfson has seen this complication occur only twice during his career. According to the medical literature, this condition occurs in about 1 in 10,000 patients who take the medication. Further, Dr. Wolfson desires to medicate the defendant with newer drugs, which have a much lower side effect profile than older medications.

It is also Wolfson's opinion that the only way to treat Sell's condition is with the use of anti-psychotic drugs, and it would be irresponsible and wrong not to use these medications. Without these medications the defendant will continue to suffer from a catastrophic and debilitating illness, from which he is never likely to recover. For all of these reasons, Wolfson believes that the benefits of using the medication far outweigh any risk from the medication in any patient he would treat for this illness, whether or not the person was incarcerated or institutionalized in any way.

At the conclusion of the hearing, both the defendant and the government requested permission to delay briefing the issues presented at the hearing until after a transcript was prepared. After requests for more time to file the memoranda by both parties, the briefs were eventually filed before the court at the end of January, 2000. Almost simultaneously with the filing of these memoranda, on January 31, 2000, Sell's attorneys filed a motion for relief from involuntary commitment stating that he was being illegally held at Springfield beyond the time permitted by the statute, and requesting that he be immediately released. Further, in partial

response to this motion, the government filed a motion for the extension of Dr. Sell's commitment to Springfield on February 3, 2000.

On March 20, 2000, the U.S. Medical Center for Federal Prisoners wrote the court asking that Dr. Sell's commitment be extended. Included in the report is a report from Dr. DeMier on Sell's mental condition. The report states that Sell's condition has deteriorated to the extent that the risk of physical injury to the staff and to Dr. Sell has become greater because of Sell's increased volatility and paranoia. Dr. DeMier also states that Sell's infatuation with the nurse at the facility has worsened to the point that his thoughts about her have outweighed other issues that should be much more important to him. DeMier described Sell's behavior as volatile because it can change suddenly without any apparent reason. In summary, DeMier concludes as follows:

> Anti-psychotic medication remains the only effective treatment for his mental illness. Without the opportunity to treat the defendant, he will continue to suffer from a debilitating and catastrophic illness, and we are placed at increased, even inevitable, risk of harm to the defendant or those charged with his care.

He further states that the use of anti-psychotic medications will provide the defendant with a good chance of being restored to competency.

### Conclusions

Based on the above facts, as well as the law stated below, the undersigned orders the involuntary medication of Dr. Sell. In the case of <u>Riggins v. Nevada</u>, 504 U.S. 127 (1992), the court stated as follows:

> Although we have not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings, Nevada certainly would have satisfied due

10

> process if the prosecution had demonstrated and the district court had found that treatment with anti-psychotic medication was medically appropriate and considering less intrusive alternatives essential for the sake of Riggins' own safety and the safety of others.

504 U.S. 127, 135.

Further, in <u>United States v. Morgan</u>, 193 F.2d 252 (4th Cir. 1999), the court stated as follows in ordering the forced medication of a pretrial detainee because the detainee was a danger to himself and others:

> The fact remains, however, that the finding that treatment with anti-psychotic medication was necessary to render Morgan competent to stand trial was accompanied by a finding that such medication was necessary because he is dangerous to himself and to others at Springfield. Although Morgan provides us with no psychiatric evidence supporting a conclusion that the dangerousness finding was made arbitrarily, he essentially requests that we disregard that finding so that we may evaluate the constitutionality of permitting Springfield medical personnel to make the determination of whether to forcibly medicate him solely for the purpose of rendering him competent to stand trial. This we are unwilling to do. We realize that forcibly medicating a pretrial detainee on the basis that such treatment is necessary because he is dangerous to himself or others in the institutional setting might have the incidental effect of rendering him competent to stand trial. However, if such an occurrence would come to pass in the present matter, Morgan would not simply be thrust into the courtroom for trial without additional procedural protections. Rather, he would be statutorily entitled to have a district judge conduct a pretrial examination of his competency to stand trial in the context of an evidentiary hearing at which time he would be represented by counsel and permitted 'to testify, to present evidence, to subpoena witnesses on his own behalf, and to confront and cross examine witnesses who appear at that hearing.' Morgan could be brought to trial only if the government proved to the district judge by a preponderance of the evidence that Morgan was able to understand the nature and consequences of the proceedings against him and to assist properly in his defense...Assuming that the government succeeded in this regard, Morgan may be entitled to even further

11

> procedural protection should the government forcibly plan to
> medicate him at any point during trial. Specifically, due process
> would require the district judge make findings as to the need for
> and medical appropriateness of such medication during trial. The
> district judge might also ensure the medication posed no significant
> risk of altering or impairing Morgan's demeanor in a manner that
> would prejudice his capacity or willingness to either react to
> testimony at trial or to assist his counsel.

193 F.3d 252, 264.

In Papantony v. Hedrick, 215 F.3d 863 (8th Cir. 2000) (a civil case filed by a prisoner at the Springfield Medical Center which the Court of Appeals construed as a Bivens action for damages) the court ruled as follows in rejecting the claim:

> A government official is immune from a Bivens suit unless the
> official's conduct violates a clearly established constitutional right.
> In Papantony's case the right is far from clearly established. In
> fact, Papantony as a pretrial detainee likely has no substantive due
> process right not to be forcibly administered anti-psychotic drugs
> to render him competent to stand trial. See Riggins v. Nevada, 504
> U.S. 127. Finally, although we reject any remedy for Papantony at
> this time, circumstances could change and anti-psychotic drugs
> might eventually render Papantony competent to stand trial. If that
> occurs, this decision will not foreclose a future argument by
> Papantony that forced medication during trial violates his right to a
> fair trial. See generally United States v. Morgan, 193 F.2d 252
> (4th Cir. 1999).

Given the above law, the undersigned concludes that the government has made a substantial and very strong showing that Dr. Sell is a danger to himself and others at the institution in which he is currently incarcerated. In addition, the government has shown that anti-psychotic medication is the only way to render him less dangerous, and that the serious side effects of the medication will be ameliorated by newer drugs and/or changing of the drugs. Further, the benefits to Dr. Sell of using the medication far outweigh any risks, the use of such

12

medication is necessary, and a strong showing of the necessity to use this medication has been made by the government. In addition, as in United States v. Morgan, supra, an ancillary effect of the use of the medication, because Dr. Sell is dangerous, is that there is a substantial probability that Dr. Sell will be returned to competency.

In United States v. Weston, 206 F.3d 9 (D.C. Cir. 2000), the court held that even if a court finds that forced medication is necessary and essential to the defendant's safety and the safety of others, the court must also consider the need for the medication in restoring competency, and the effect of the medication on the defendant's ability to assist in his defense. In the case now at bar, the record reveals that anti-psychotic medication is the only way to render the defendant both not dangerous **and** to make him competent to stand trial. If Dr. Sell is not medicated, he will continue to suffer from a catastrophic and debilitating illness, will remain incompetent, and remain a danger. According to Dr. Wolfson, if the defendant is medicated and receives psychotherapy along with the medications, his delusions will diminish to the extent that they will no longer control his thinking and actions. Given this, Dr. Wolfson's opinion is that the defendant has a good chance of becoming competent and less dangerous. Because the defendant's delusions will no longer control or dominate his thoughts and actions, the undersigned concludes that if medicated, the defendant will be able to communicate with his counsel in a rational manner in order to assist in his defense. Further, Dr. Wolfson intends to use atypical anti-psychotic drugs with a low side effect profile when medicating Dr. Sell. Dr. Wolfson also intends to avoid sedating Dr. Sell, because his purpose is to allow him to participate meaningfully in his trial. He likewise intends to avoid all other side effects to the

maximum extent possible. Thus, the undersigned concludes that the standard required in Weston, supra, has been met in the case now at bar.

Based on the above, the undersigned concludes that the government has shown in as strong a manner as possible, that anti-psychotic medications are the only way to render the defendant not dangerous and competent to stand trial on the very serious and violent offenses for which he now stands indicted. There are no other less restrictive means by which this may be accomplished, including other medications, psychotherapy without the use of anti-psychotic medications, and locking down the defendant, all of which have either been attempted or considered. Therefore, the undersigned concludes that Dr. Sell must be involuntarily medicated with anti-psychotic medications.[1]

Based on the above facts and law, the undersigned grants the government's motion for extension of his commitment for a 120-day period of time, because there is a substantial probability that within such period of time, Dr. Sell will attain the capacity to permit the trial to proceed if medicated. The undersigned further notes that because the defendant has (as is his absolute right) refused to take anti-psychotic medication, and explored all legal means possible to avoid taking the medication, Dr. Sell has not yet been treated with the only treatment which the undersigned has concluded will render him less dangerous and competent. Therefore, based on the above, the government's motion for extension of commitment is granted.

---

[1] The defendant cites United States v. Brandon, 158 F.3d 947 (6th Cir. 1998) as controlling in this matter. Although the undersigned believes that the government has met the standards required by Brandon, it solely involves the legality of the medication of a non-dangerous pretrial detainee unlike the case now at bar.

14

The defendant also alleges that he is being unlawfully held beyond the time authorized by the statute, and that it is unconstitutional to indefinitely commit him for purpose of rendering him competent. In United States v. Kokoski, 82 F.3d 411 (4th Cir. 1996), the court ruled that the defendant's right to due process was not violated by an 18-month commitment to obtain his competency. In so holding, the court stated as follows:

> He first argues that § 4241(d) limits the time he may be hospitalized to eight months...We reject this argument. We think 'an additional reasonable period of time' means some reasonable but statutorily undefined period of time. United States v. Ecker, 30 F.3d 966, 969 (8th Cir. 1994). Here we find that Kokoski's 18-month confinement was reasonable. Every report issued before the Butner staff declared Kokoski competent indicated he was likely to regain competency. The final six months of his confinement were necessary to challenge and clarify Butner's conclusion. In light of the district court's careful adherence to statutory procedures, we believe Kokoski's confinement was reasonable. See id. (confinement during seven competency evaluations spanning nearly four years not unreasonable).

82 F.3d 411, 1996 WL 181482. Further, in United States v. Ecker, 30 F.3d 966 (8th Cir. 1994), a case involving at least five competency commitments over a three and a half year period of time, the court stated as follows: "The overall determination of ultimate competency to stand trial can extend over a reasonable period." Id. at 970. Having considered the background and evidence, the Eighth Circuit held that there "was no clear violation of the statute in ordering each of the several competency evaluations nor an unreasonable overall delay in the proceedings under the circumstances." Id. at 970.

Based on the above law, the defendant's request for relief from involuntary commitment should be **denied**.

Therefore,

15

**IT IS HEREBY ORDERED** that the government may involuntarily medicate the defendant with anti-psychotic drugs consistent with this memorandum. It is also **ORDERED** that this portion of the court's order shall be stayed for fourteen (14) days to allow the defendant to appeal this portion of the order if he so desires. Any further stay must be granted by a United States District Judge or the United States Court of Appeals.

**IT IS FURTHER ORDERED** that the government's request for an extension of the defendant's commitment be **granted**, and that his commitment is ordered extended for a 120-day period of time effective as of the date of this order.

**IT IS FURTHER ORDERED** that defendant's request for relief from involuntary commitment should be **denied.**

**IT IS FURTHER ORDERED** that this Memorandum and Order supersedes the Interim Order entered by this court on July 28, 2000.

_____
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of August, 2000.

16

```
              UNITED STATES DISTRICT COURT -- EASTERN MISSOURI
                           INTERNAL RECORD KEEPING


AN ORDER, JUDGMENT OR ENDORSEMENT WAS SCANNED, FAXED AND/OR MAILED TO THE
FOLLOWING INDIVIDUALS ON 08/10/00 by ksterret
            4:98cr177     USA vs Sell


COPIES FAXED AND/OR MAILED TO THE PARTIES LISTED BELOW AND THE
UNITED STATES PROBATION OFFICE AND UNITED STATES PRETRIAL SERVICE OFFICE.
IF THIS IS A JUDGMENT IN A CRIMINAL CASE SEND CERTIFIED COPIES TO THE
FOLLOWING:    4 Certified Copies to USM
              2 Certified Copies to USP
              1 Copy to Financial
              1 Copy to O.S.U.

Linda Hogan -    69095            Fax: 314-721-1710
Lee Lawless -    3650             Fax: 314-421-3177
Howard Marcus -   16980           Fax: 314-539-7695
Arthur Margulis -   7883          Fax: 314-721-1710
Barry Short -    4358             Fax: 314-241-6056
```

SCANNED & FAXED BY:

AUG 1 0 2000

J. M. W.